The plaintiff brought this suit to recover compensation for total and permanent disability in the maximum sum of $20 per week for a period not exceeding 400 weeks, plus $63, the amount paid for medical expenses, less the compensation previously paid for 12 weeks at the rate of $18.37 per week. The insurer for the defendant lumber corporation was attempted to be joined in the suit, but on account of a misnomer in the name of the insurance company, no judgment was rendered against it, and the insurance company has passed out of the case.
The plaintiff alleges that he was injured while driving a truck for the Kirby Lumber Corporation on January 17, 1945; that a log train collided with the log truck which he was driving, throwing him from the truck and seriously injuring the bones, cartileges, nerves and muscles of his back; that the injury produced total disability to do work of a reasonable character.
The lumber corporation admits that plaintiff was in its employ as a truck driver *Page 777 
on January 17, 1945, and admits that the company had notice of the accident and injury and that compensation was paid plaintiff at the rate of $18.37 per week from January 24, 1945 to May 11, 1945, or a total of $220.44. The employer denied that plaintiff suffers any further disability from the alleged injury after compensation payments were discontinued. The employer also alleged that plaintiff was receiving 49 cents per hour for a ten hour day, not exceeding 40 hours per week, or a weekly wage of $28.26.
The trial court rendered judgment in favor of plaintiff and against the Kirby Lumber Corporation for compensation at the rate of $20 per week for a period not exceeding 400 weeks, beginning January 17, 1945, with legal interest on the past-due payments, subject to a credit of $220.44 already paid as compensation; also for the sum of $63 for medical expenses incurred by plaintiff, reserving to him the right to sue for further medical expenses not to exceed the total sum of $600. The defendant has appealed.
[1] The principal question in this case is whether or not the plaintiff is disabled and has been disabled since his compensation payments were discontinued. There is a denial in the answer of the weekly wage which plaintiff claims should form the basis for his compensation, however, the trial judge awarded him the maximum of $20 per week, and we are satisfied that the record justifies that rate of compensation. The plaintiff was working under a contract on the basis of 49 cents per hour for a 10 hour day and for 6 days a week. This would make his total weekly compensation $34.30, based on 49 cents per hour for 40 hours per week, plus time and a half for the remaining 20 hours per week. 65% of his weekly wage would be more than the maximum compensation of $20 per week. In any event, counsel for defendant does not seem to question the amount of weekly compensation awarded by the trial judge.
This case involves a back injury and we find in the record a very great divergence of opinion among the doctors who testified in this case as to plaintiff's condition. As is usual in back injury cases, the medical testimony is not positive and uniform as the doctors are frequently unable to find any objective symptoms to account for the pain and limitations of motion in the back of which the plaintiff complains.
The testimony shows that the truck plaintiff was driving was struck by a train and the truck loaded with logs was turned over on its side. Plaintiff was thrown from the truck some 15 feet, or crawled that distance after the truck was struck by the train. He was found in a dazed and half unconscious condition and was carried to an automobile and taken to the company's first aid station where Dr. Smith, the company doctor, gave him some morphine injections to relieve his pain. He was taken to the Frazer Clinic at DeRidder where X-rays were made of his spine. He stayed in this clinic for either a day or as long as three days, according to some of the testimony, and was then sent home in an ambulance where he was confined to his bed for 6 or 7 weeks according to plaintiff's testimony, but according to the testimony of Dr. Smith, he was confined to his bed for only 4 or 5 weeks.
There is testimony by plaintiff and several others to the effect that he stayed in bed 6 or 7 weeks and could hardly turn himself over while thus confined; that he was able to sit up after that time, but had to use crutches and was assisted in getting around on account of the condition of his back. Several lay witnesses testified that plaintiff could do no work at all, and had been unable to do any work up to the date of the trial.
Plaintiff was examined by a number of doctors, and we find their opinions in much conflict as to whether or not plaintiff suffers a disability resulting from the accident. Four doctors testified in favor of plaintiff, and their testimony is rather positive to the effect that plaintiff does have a serious back condition which renders him unable to do any kind of hard work.
The first doctor who testified for plaintiff was Dr. Reid of Leesville who testified that plaintiff came to him in June, 1945, some 5 months after the accident, and Dr. Reid treated plaintiff from that time until *Page 778 
the trial of the case in February of the following year. Dr. Reid had X-rays made of plaintiff's back in June, 1945, which show, according to his testimony, that there is almost a complete fusion of the fifth lumbar vertebra and the sacrum; that plaintiff had muscle spasms, which he considered involuntary in the area of the lumbar spine. He says the cartilege pad between the fifth lumbar vertebra and the sacrum is almost completely gone, thus causing the bones to join and resulting in pain when plaintiff moves his back. Dr. Reid removed a discolored mass about the size of a 50 cent piece in the region of the fifth lumbar vertebra in October, 1945, and he expressed the opinion that some injury or bruise caused this lump or mass to form. He says that plaintiff complained of great pain, but was relieved somewhat after this lump was removed, but he is still disabled. Dr. Reid had another X-ray made of plaintiff's spine in February, 1946, which showed the same condition as the previous X-ray, with some exaggeration in the arthritic developments. He thinks plaintiff has both atrophic and hypertrophic arthritis in the lumbar spine.
Dr. Byrd examined plaintiff in July, 1945, and found muscle spasms and tenderness over the lumbo-sacral region; scoliosis (bending outward of the spine due to injury or disease); X-ray at that date revealed atrophic arthritis and absorption of the body of the fifth lumbar vertebra and hypertrophic arthritis, with some mild ankylosis of the lumbo-sacral articulation. Dr. Byrd examined plaintiff again in February, 1946, and found continued muscle spasms and tenderness. He examined an X-ray made in February, 1946, which showed further density in the fifth lumbar vertebra and diagnosed plaintiff's trouble as hypertrophic arthritis with atrophy of the body of the fifth lumbar vertebra, and fusion between this vertebra and the sacrum. He states that plaintiff is unable to do hard work.
Drs. Broyles and Sanders examined plaintiff in February, 1946, and made about the same findings as Drs. Reid and Byrd. These two doctors also state that plaintiff is disabled from doing hard work on account of the condition of his back.
Dr. Smith, the company doctor, examined plaintiff immediately after the accident. He testified that he found no bruises or abrasions. He strapped plaintiff's back, gave him relief for his pain and sent him to Dr. Frazer's Clinic on the day of the injury. X-rays were made at the clinic which were examined by him and Dr. Frazer. He testified that these pictures showed no back injury. He sent plaintiff home and attended him regularly for several weeks. He said plaintiff stayed in bed 4 or 5 weeks, after which he was able to sit up. Dr. Smith treated plaintiff until April, when he was discharged as being able to return to work. It is significant to note that the company doctor treated plaintiff for three or four months indicating that he must have thought his injuries were rather serious. A witness for the defendant testified that only serious injury cases were sent to Dr. Frazer's Clinic.
Dr. Frazer did not testify in the case, but it was admitted that if he was present and testified that he would state he found no evidence of injury in the X-ray made of plaintiff's back at the time plaintiff was in his clinic. Drs. Shaw, Talbert and Watkins examined plaintiff one time each and could find nothing wrong with plaintiff's back.
Dr. Hatchette made X-rays of plaintiff's back in July, 1945, and he testified that these pictures show no injury or pathology, except one of the pictures shows a mild lipping on the upper anterior edge of the fifth lumbar vertebra.
We therefore have the opinion of four doctors who examined plaintiff clinicly and also examined X-rays made of his back and these doctors are of the opinion that plaintiff does have a condition in his back which renders him disabled from work. On the other hand, five doctors testified from their examination of plaintiff and from the X-rays which they examined they could find nothing to justify plaintiff's complaints. Counsel for defendant insists that we should give Dr. Hatchette's opinion and testimony greater weight than that of the other doctors for the reason that he has specialized in making and reading X-rays for several years. *Page 779 
[2] In the case of Austin v. Industrial Lbr. Co., La. App.,8 So.2d 727, we undertook to give the rule with reference to the method of evaluating the testimony of experts. And in the case of Miller v. W. Horace Williams Co. et al., La. App.,8 So.2d 734, we discussed the question of the weight to be given medical testimony where there is a difference of opinion among the doctors. We cannot agree with counsel's contention that we should give greater weight to the opinion of Dr. Hatchette than to that of the other doctors. No doubt Dr. Hatchette is a specialist in his field, but it must be remembered that he only made these X-ray pictures and did not have the opportunity of examining and observing plaintiff on several occasions, as did some of the other doctors. Moreover, only one of the pictures made by Dr. Hatchette shows the region of the fifth lumbar vertebra and sacrum where most of the trouble seems to be located, and some of the other doctors who examined this picture stated that it was rather hazy and did not reveal a clear view of the condition. Furthermore, Dr. Hatchette himself admits that there appears to be a lipping on the upper edge of the fifth lumbar vertebra which shows in itself that something is wrong.
[3] The decided preponderance of the medical evidence shows that there is almost a complete fusion between the fifth lumbar vertebra and the sacrum and this condition can account for plaintiff's back pain when he moves his back. There is no doubt an arthritic condition which contributes to his back trouble, and which resulted from or was aggravated by the accident.
It seems to us if we are to give any more weight to the opinion of any doctor over that of another, it should be given to the opinion of Dr. Reid, who not only examined this man several times and operated on him, but also treated him for more than six months. He has certainly had a better opportunity to observe the plaintiff and to know whether or not he is faking than most of the other doctors who examined him only once or twice.
It is true that Dr. Smith, the company doctor, treated plaintiff for 4 or 5 months, and he testified that in his opinion there is nothing wrong with plaintiff's back. However, as we have already stated, Dr. Smith must have thought that plaintiff had a rather serious condition as he treated him over a period of several months.
There is some testimony by at least three witnesses to the effect that Dr. Frazer stated to them while plaintiff was in his clinic just after the accident that plaintiff had a serious back injury, and it would be a long time before he would walk, if he ever did walk, or words to that effect. As stated above, Dr. Frazer did not testify since he was in a hospital in New Orleans, but it was admitted that if he did testify, he would deny making these statements. However, we hardly see how three witnesses could have made up this story unless Dr. Frazer did make some statement similar to that attributed to him, or at least make some statement which led these men to believe that plaintiff was seriously injured, even though he did not make the exact statement which they undertook to quote.
[4] It remains a fact that plaintiff was working before the accident, and so far as the record shows had never had any trouble with his back before. If plaintiff is faking a disability, he has succeeded in fooling many of his neighbors as well as several doctors. As has been often said, the courts are reluctant to hold that a compensation claimant is a malingerer, and we are not prepared to hold in this case that plaintiff is faking an injury.
Finding no error in the judgment appealed from, the same is hereby affirmed at the cost of the defendant in both courts. *Page 780